Original proceeding in disbarment; argued April 15; defendant
disbarred May 27; rehearing denied September 4, 1930

## STATE ex rel. JOSEPH v. MANNIX

(288 P. 507, 290 P. 745)

*Arthur Clarke* of Corvallis, *Arthur K. McMahan* of Albany, and *A. E. Reames* of Medford, for plaintiff. *Frank J. Lonergan* of Portland for defendant.

ROSSMAN, J. Mr. Thomas Mannix, a duly licensed member of the bar of this state was tried by three circuit court judges, whom this court had previously appointed as referees, on a rule to show cause why he should not be removed from the roll of attor-

neys; the order was granted upon the petition of Mr. George W. Joseph. The charges against the defendant are extensive and we shall mention only those upon which the referees made findings. These are (1) that the defendant between the dates of June 28, 1921, and August 27, 1924, obtained money under false pretenses through the instrumentality of eight bank checks issued by himself at times when he knew that his accounts with the banks were insufficient to enable them to honor these checks; (2) that in the prosecution of a series of cases, to which the parties refer as the Wemme cases, the defendant (a) repeatedly endeavored to deceive the various courts before which he appeared, (b) that these suits were not legal or just, that they did not appear so to the defendant, and that he maintained them for selfish purposes only, and (c) that his conduct in the maintenance of this litigation was rendered further improper by reason of the fact that he had been paid $7,500 for services performed in the establishment of the charity which these suits sought to destroy.

The findings of the referees were unanimous to the effect that these charges were sutained by the proof. Two of the referees recommended that the license of the defendant to practice his profession be suspended for three years' time; the third advised that the defendant's license be withdrawn forever. To the findings of the referees the defendant filed objections; he contends that the record does not warrant their conclusions.

The evidence is voluminous; we have examined it, however, with care. We shall first dispose of the charges which accuse the defendant of having obtained money under false pretenses by issuing eight bank

checks at times when his credit with the banks was insufficient to enable them to honor the checks. Five of these checks, each in the sum of $10, were cashed by the defendant at an establishment known as the Basket Grocery & Delicatessen; two more, one in the sum of $200 and the other in the sum of $20, were cashed by an individual named J. J. Mazurosky. The defendant concedes that he issued these seven checks, and at the trial apparently did not seriously dispute the testimony presented by the prosecution that the banks refused to honor them because his account was insufficient to enable their payment. Witnesses testified that when the Basket Grocery & Delicatessen company was unable to obtain payment of the five checks cashed by it it delivered them to one F. C. Lynch for collection. When Lynch failed to obtain results he commenced an action upon them in August of 1928. To his complaint, which alleged these checks and several acounts assigned to him by other creditors of the defendant, the latter filed a demurrer. This demurrer had not been disposed of at the time of the hearing before the referees; but the defendant, according to his own testimony, shortly after filing the demurrer commenced to make instalment payments to Lynch upon several of the claims alleged in Lynch's complaint. Shortly before Mr. Joseph filed his charges against the defendant the latter discovered that the five Basket Grocery & Delicatessen checks were being sought by his accuser, and thereupon hastily paid to their holder the sum of $50. He contends that this constituted a second payment of them and testified that shortly after the dishonor of four of these checks he was advised of that fact and paid $40 in cash to the Basket Grocery & Delicatessen company; he further testified that about a year later, when he discovered

that the fifth check had also been dishonored, he paid the same company its amount. The fact that he did not obtain a return of the checks he ascribed to carelessness. The Mazurosky checks, Mr. Mannix contends, have been fully paid. He testified that when he was advised that the $200 check had been dishonored he promptly paid Mazurosky $200 in cash, and that still later at Mazurosky's request performed services as an attorney of the value of $200 for his brother. He testified that when the $20 check was dishonored he promptly paid its holder the sum of $20. Both of these checks were in the possession of Mazurosky until they became exhibits in this case.

It will be observed from the fact that the defendant testified that after the dishonor of all seven of the above checks the matter was called to his attention, and he thereupon paid to their holders the amount for which they were drawn, he thereby admitted that when he issued these checks (1) his credit at the bank was insufficient, (2) that he obtained value for the checks from those who cashed them, and (3) that he had actual notice of their dishonor by the banks. If any of these inferences are erroneous, testimony, which we believe is free from contradiction, supplies each of the above items. The above being the facts the only issue to be determined is whether the defendant paid to the holder the amount for which the checks were drawn after he received notice of their dishonor: § 1964-1 and § 1964-2, Or. L., which were in effect at the time of these transactions, provided thus:

"Any person who, with intent to defraud, shall make or draw, or utter or deliver, any check, draft or order, for the payment of money, upon any bank or other depositary, knowing at the time of such making,

drawing, uttering or delivering, that the maker, or drawer, has not sufficient funds in, or credit with, such bank or other depositary, for the payment of such check, draft, or order, in full, upon its presentation, shall be guilty of a misdemeanor, and punishable by imprisonment for not more than one year, or by a fine of not more than one thousand dollars, or both fine and imprisonment.''

''As against the maker or drawer thereof, the making, drawing, uttering, or delivering of a check, draft or order, payment of which is refused by the drawee, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in, or credit with, such bank or other depositary, provided such maker or drawer shall not have paid the drawee thereof the amount due thereon, together with all costs and protest fees, within two days after receiving notice that such check, draft or order has not been paid by the drawee.''

The referees found against the defendant upon the issue of payment; we accept this finding as our own.

We come now to the eighth check, which was in the amount of $15 and which was sent to the county clerk of Yamhill county as payment of a filing charge of a complaint which instituted a suit August 27, 1924, in which Mary Mannix, a relative of the defendant, was the party plaintiff. The county's charges being only $12.50 the clerk mailed to the defendant his check for $2.50 which was promptly cashed by its recipient. The defendant admitted that Mary Mannix came to his office and consulted him before this action was instituted, that the pleading was written upon his stationery, and that his name was signed to the complaint. He denied, however, (1) that the signature to the complaint was written by himself, (2) that he was the author of the $15 check, (3) that the endorsement on

the back of the $2.50 check was in his writing, and (4) that he received this rebate. In fact, he contended that he knew nothing about these two checks until a short time before the filing of the disbarment charges. He testified that when Mary Mannix came to his office he referred her to his stenographer and an office associate, and that thereafter he took no interest in her piece of business. When the $15 check was dishonored and the $2.50 check was cashed, the county clerk mailed a series of three letters to the defendant, demanding payment of the dishonored check; still later upon the clerk's motion, a copy of which was mailed to the defendant's office, the complaint was stricken from the circuit court's files on account of the nonpayment of the filing fee. Although the testimony disclosed that these letters and the above-mentioned notice were properly addressed and mailed to the defendant's office, he denied their receipt. His testimony vaguely suggests that his stenographer, a young man who has since been admitted to the bar and who is now associated in the practice of law with the defendant, wrote the $15 check, and endorsed the defendant's signature to the $2.50 check. However, the defendant did not call this young man as a witness, nor Mary Mannix, nor the office associate to whom he claims he referred her. Neither did he produce his check stubs or other similar office records. His testimony does not account for his failure to inquire from his relative and from his office associates the outcome of a case concerning which he was consulted, beyond his assertion that in that year he was frequently absent from Portland. It is evident, however, that at approximately the time when this incident occurred the defendant was in Portland applying for fees in the first Wemme suit, which we shall later men-

tion. The referees found that the defendant was the author of the $15 check; a preponderence of the evidence certainly supports their finding.

We come now to the question whether the fact that the evidence convinces us that the defendant committed the eight above acts, which under the laws of our state constitute crimes, is a sufficient basis for an order suspending or revoking his license. The presecution has not supported its charges with a judgment of guilt in a criminal action, and it is evident that the statute of limitations, Or. L., § 1377, would now bar a criminal prosecution. Only one of the above eight acts was done while the defendant was performing a professional service.

■ The statute of limitations is no defense to a proceeding for the disbarment or suspension of an attorney: *In re Weed,* 26 Mont. 507 (68 P. 1115); Thornton on Attorneys at Law, § 880; 6 C. J., Attorney and Client, 601, § 61.

■ ■ Even though acts, committed by an attorney, are indictable, are in no way connected with his professional employment, and are not substantiated by a judgment of guilt in a criminal action, nevertheless they warrant an order suspending or revoking his license, when they are of such a gross character as to seriously impugn his integrity and his standing as a member of the bar: *State ex rel. v. Winton,* 11 Or. 456 (5 P. 337, 50 Ann. Rep. 486); *Ex parte Cowing,* 26 Or. 572 (38 P. 1090); 2 R. C. L. Attorneys-at-Law, 1101, § 194. The proof in the absence of a judgment of guilt should, of course, be clear and convincing. It has been pointed out by the court of one of our sister states that a judg-

ment of guilt in a criminal action will not be insisted upon when the limitation period has barred prosecution: *In re Weed,* supra.

Several courts have held that when it is shown that an attorney has obtained money under false pretenses he should be disbarred: *People ex rel. v. Ford,* 54 Ill. 520; *People v. George,* 186 Ill. 122 (57 N. E. 804); *In re Weed,* supra; *McCarthy's Case,* 42 Mich. 71 (51 N. W. 963); *In re Comyns,* 132 Wash. 391 (232 P. 269); *In re Smith* 216 App. Div. 173 (213 N. Y. S. 751). From the latter authority we take the following excerpt:

"A conviction of a member of the bar for petty larceny of $35, evidenced by obtaining the money by the giving of a worthless check upon a bank in which he has no account, demonstrates his unfitness to remain a member of the honorable profession of the law."

For the reasons that follow we are of the opinion that the acts committed by the defendant in these eight instances are sufficiently serious to warrant us in taking action, even though they are not substantiated by a judgment of guilt in a criminal cause.

■ Here we have eight acts of a like character which to a substantial extent indicate the development in the defendant of a very bad practice. The evidence proves that repeated demands for payment of his checks were made upon Mr. Mannix without avail. Seven of the dishonored checks were assigned to collectors who could obtain no results. An action instituted upon five of them brought nothing more than a demurrer. A rumor of disbarment proceedings was required to bring payment. Such conduct upon the part of an attorney displays a serious lack of integrity, and affects not only himself but also the entire bar. Besides being a mem-

ber of a learned profession an attorney is an officer of the courts, who by granting him a license to practice his profession hold him out to the community as one possessed of sufficiently good character to warrant confidence and trust. It is true that to be entitled to continued membership in the bar it is not essential that an attorney should be free from every vice and every objectionable personal fault, but when he has acquired habits which render him unworthy of the great trust generally accorded to the members of the profession, or when his habits have become such that they scandalize his calling or the courts in which he practices, his license should no longer be continued. The attribute of common honesty is one that we believe every attorney should possess. When repeated acts of grave misconduct upon his part show its absence, and his code of ethics is revealed as one that permits him to issue repeatedly worthless checks which he neglects to redeem even after suit, public policy and a due respect for the confidence which the legal profession invites the public to repose in its membership, demands that we should say he is no longer fit to be enrolled among those who condemn dishonesty and seek to serve the cause of justice. Such conduct impugns his integrity and warrants a suspension or a disbarment.

■ After this matter had been submitted to the referees for their decision, the defendant served upon the law partner of his accuser an affidavit which averred that the defendant had come into possession of additional evidence showing, (1) that when he issued the two Mazurosky checks he had no intent to defraud, (2) that when the $2.50 check, signed by the county clerk, was sent to the defendant's office his financial condition was such that he had no motive for wrong-

fully appropriating money not due to him, and (3) that the five Basket Grocery & Delicatessen checks had been paid by him with cash shortly after they were dishonored. This affidavit was not called to the attention of the prosecutors until shortly before the argument in this court; hence the statements of the defendant in his affidavit have not been subjected to cross-examination. We have, however, considered carefully the contents of the affidavit and the exhibits, but we do not believe that we would be warranted in affording the defendant an opportunity to produce the evidence suggested by his motion. The affidavit recites that June 27, 1921, he deposited with his bank $385, and on June 30, 1921, the further sum of $350. He contends, therefrom, that when he issued the $200 Mazurosky check his account was sufficient to warrant the bank in honoring it. To support these averments the affidavit displays a deposit book and the bank's ledger sheet. The deposit book is marked ''duplicate,'' and while the ledger sheet shows numerous transactions, the deposit book contains only five entries, two of which acknowledge the deposits mentioned in the affidavit. The ledger sheet, however, does not record any deposit of the $350 item. The fact that the ledger sheet does not corroborate the duplicate deposit book and the affidavit, we believe, discredits both. The $200 check is dated June 28, 1921; the evidence does not disclose when it was delivered to Mazurosky or tendered to the bank for payment. It is marked, however, ''N. S. F.'' The ledger sheet shows that immediately preceding June 27 the defendant's balance was $2.80; June 27 it became $282.80, and on July 8 it again dropped to $2.80 and never thereafter amounted to as much as the face of this check. April 28 the account was apparently closed. It is evident that we would not be warranted in remanding this mat-

ter to the referees to receive this testimony. The defendant's *motion aforementioned has* attached as an exhibit the affidavit of George Celsi, who refers to himself as the manager of the Basket Grocery & Delicatessen company. Mr. Celsi's affidavit avers that shortly after he notified Mr. Mannix that his checks had been returned by the bank "he gave me some money to cover these checks. Later on, through some mistake in bookkeeping, this money was not credited as against the checks but was applied on his merchandise account." Mr. Celsi did not testify at the trial although he was present upon the subpoena of the defendant and held a conference with him. It seems to us that under these circumstances it is now too late to ask the court to reopen the taking of testimony in order that Mr. Celsi might give the foregoing testimony. Other matters, mentioned in the motion and its accompanying affidavit, are subject to similar infirmaties, or are not sufficiently material to warrant us in remanding the cause to the referees to receive this testimony. The motion will therefore be denied.

Having arrived at the conclusion that the defendant is guilty of offenses sufficiently serious to warrant the court in suspending or revoking his license we might be justified in proceeding no further, but we shall go on and dispose of the charge which alleges that the defendant practiced deceit upon the courts. This charge involves the consideration of more than 200 pages of testimony taken in this proceeding, together with another transcript which records the testimony received in a former suit, and many briefs, pleadings, court files and abstracts of record used in former suits. On account of this voluminous condition of the record we deem it advisable to divide this charge into three sub-

divisions. Into the one we have placed that part of the charge which alleges that in the prosecution of the Wemme cases the defendant misrepresented to the circuit court, the United States District Court for Oregon, the federal Circuit Court of Appeals for the Ninth Circuit, and to the United States Supreme Court the status as a party plaintiff of a corporation entitled the E. Henry Wemme company in the so-called first suit reported as *Wemme v. First Church of Christ,* 110 Or. 179 (219 P. 618, 223 P. 250). In the second subdivision we have placed the portion of the charge which avers that the defendant, following the conclusion of the suit just mentioned, in an application for an attorney fee out of the public charitable trust fund therein established, misrepresented to the circuit court and to this court the services which he had performed and for which he sought compensation. The third subdivision of these charges alleges that in the prosecution of the Wemme cases the defendant was not endeavoring to maintain litigation well founded in law, nor which he believed was justifiable, but was acting in bad faith for selfish motives of personal gain, and was endeavoring to destroy a charitable trust out of which he had been paid $7,500 for services performed in assisting to establish it.

In order to facilitate an understanding of our disposition of these charges we mention the following facts which are free from dispute: E. Henry Wemme died testate in the city of Portland, December 17, 1914, leaving an estate of great value and apparently no immediate relatives except five brothers and sisters, who were citizens of Germany. A copy of the portions of Mr. Wemme's will, which make provision for the charitable trust mentioned in the preceding paragraph,

may be found in our decision in *Wemme v. First Church of Christ,* supra; other parts of the will provided that the E. Henry Wemme company, of which Mr. Wemme owned all of the capital stock with the possible exception of two shares, which enabled two of his associates to qualify as directors, was made the sole residuary legatee of his will. The portion of Mr. Wemme's will, which appears in the above mentioned volume of our reports, provided for the establishment of the charitable trust; to this end it devised to three of his friends property of the value of approximately $350,000, directed them to organize immediately upon the testator's death a corporation to be known as the "E. Henry Wemme Endowment Fund," and to transfer to it the property left to them in trust. The will required that the corporation should thereupon erect a "maternity home for unfortunate and wayward girls" to be known as the White Shield Home, and that three years after Mr. Wemme's death the trustees, who by the terms of the will were to be the sole stockholders of the E. Henry Wemme endowment fund, should "transfer to the different churches of the Church of Christ Science of Portland * * * all of the capital stock of said E. Henry Wemme endowment fund in equal parts, to be theirs forever, for their own respective uses and benefit and without any charge or trust reserved to my estate of whatever kind or nature. * * *"

Upon Mr. Wemme's death the three trustees assumed their offices, brought about the incorporation of the charitable trust, built the maternity home, and at the end of three years transferred all of the capital stock of the E. Henry Wemme endowment fund to the Christian Science churches of Portland. Shortly after the latter came into possession of this stock they

ceased the operation of the maternity home on account
of a conflict between a statute of this state, which
required specific medical supervision at such an insti-
tution, and the faith of their members. Later the
churches sold the maternity home to the Salvation
Army, which thereupon proceeded with its operation.
Still later the churches devised a plan to employ the
endowment fund for another charitable purpose and in
July of 1922, when they were about to proceed with
their project, the suit, reported as *Wemme v. First
Church of Christ, Scientist,* 110 Or. 179, was instituted
in the circuit court of this state by the defendant, as
attorney for the plaintiffs, for the purpose of defeat-
ing that portion of the will quoted in the above cited
volume of our reports. The plaintiffs, named in the
caption of the complaint and all other pleadings pub-
licly filed in that case up to the findings of fact, were
the five brothers and sisters of Mr. Wemme; but at the
conclusion of the suit, when the findings of fact were
handed to the circuit judge for his signature, the E.
Henry Wemme company, a corporation, was included
as a party plaintiff. The same corporation's name was
included in the decree, and from that time on we find
its name appearing as a party plaintiff in the notices
of appeal, undertakings, abstracts of record, briefs and
all similar documents. We shall mention these matters
again as we proceed with the consideration of the
charges, but for present purposes it will suffice to notice
that the corporation's name first appeared as a party
plaintiff in the court records in the findings of fact.
After that suit was begun an amended complaint was
filed which made the Attorney General of this state a
party defendant. His answer contained a cross-bill
which prayed that the fund be declared a public charity.
The answer of the churches alleged that by virtue of

the provisions of the will they were the owners of the fund, equitable as well as legal. The decree of the circuit court, in favor of the churches, was reversed on appeal by our decision which held that the fund was a public charity. The decision of this court remanded the cause to the circuit court with instructions to appoint trustees to operate the charity, and with further instructions to award to all the attorneys who opposed the demands of the churches a reasonable attorney's fee. In the circuit court the defendant in his application for a fee, filed an itemized statement of his charges, and as a witness described the services which he had performed. Among other items for which he sought compensation was time consumed and expenses incurred in a trip to Washington, D. C., for the purpose of "obtaining permission from the Alien Property Custodian to join him as a party to the suit * * * in order to make the title clear." Since all of Mr. Wemme's heirs were citizens of Germany the Alien Property Custodian, in obedience to the requirements of the Trading with the Enemy Act (40 U. S. Statutes at Large, 411 and 41 U. S. Statutes at Large 977), had seized 92 per cent of the corporate shares of the capital stock of the E. Henry Wemme company which the will bequeathed to them. After the Alien Property Custodian had seized the capital stock he caused the election of a new board of directors, and thus took control of the corporation. It is the contention of the prosecution that the accused misrepresented to the circuit court and to this court the services he had performed in negotiating for the Alien Property Custodian's consent that the corporation be joined as a party plaintiff in the first suit.

The first suit came to a close February 26, 1924. The application for attorney fees was finally disposed of June 17, 1924; see *Wemme v. First Church of Christ, Scientist,* 111 Or. 386 (227 P. 277), and the proceedings for an accounting between the trustees and the churches was concluded July 7, 1925; see *Wemme v. First Church of Christ, Scientist,* 115 Or. 281 (237 P. 674).

Reverting to the charges that Mr. Mannix in subsequent litigation misrepresented the status of the E. Henry Wemme company as a party plaintiff in the first suit we come now to what the parties refer to as the second suit. This was a suit filed December 22, 1925, in the United States District Court for Oregon by the defendant as attorney for "Howard Sutherland, as Alien Property Custodian for the United States of America; E. Henry Wemme Company, a corporation, plaintiffs." The trustees of the charitable trust, together with E. Henry Wemme endowment fund, the Attorney General of the state and the district attorney for Multnomah county were the parties defendant. After the complaint had been filed Mr. Guy Corliss joined the defendant as associate counsel. The purpose of this suit was to obtain a decree holding invalid that portion of the testator's will which made provision for the charitable trust. After the district court dismissed the suit the defendant as one of the attorneys for the plaintiffs prosecuted an appeal to the Circuit Court of Appeals which affirmed the decision of the district court; see *Sutherland v. Selling,* 16 Fed (2d) 865. The defendant then applied for a writ of certiorari to the United States Supreme Court which was denied; see *E. Henry Wemme Co. v. Selling,* 273 U. S. 760 (47 S. Ct. 475; 71 L. Ed. 878). A material issue in that suit, as in all of the Wemme cases, was whether the E. Henry

Wemme company had been a party plaintiff in the first suit. The defendants contended for the affirmative of that issue; Mr. Mannix as attorney for the company insisted otherwise. He submitted that its name crept into the record inadvertently. It is the contention of the prosecutors that in the pleadings in that suit, which were subscribed and sworn to by the defendant, and in his various briefs he wilfully sought to deceive the federal District Court, the Circuit Court of Appeals and the federal Supreme Court into the belief that the corporation was not a party plaintiff in the first suit. The decision in the United States Supreme Court was announced March 24, 1927. April 7, 1927, after the control of the Alien Property Custodian over the E. Henry Wemme company had ceased, the defendant on its behalf filed the suit in the circuit court of this state to which the parties refer as the third case. It was the theory of the complaint in that suit that the corporation was not a party to the first suit, and, therefore, was not bound by its decision; further, that the subject-matter of the suit was not controlled by the decisions in the federal courts on the ground that those courts had no jurisdiction over it. The purpose of this suit was to overthrow the charity and recover the trust fund from the trustees. The circuit court dismissed the suit and this decision was affirmed by us in *E. Henry Wemme Co. v. Selling,* 123 Or. 406 (262 P. 833). The defendant's writ of certiorari to the federal Supreme Court was denied; see *E. Henry Wemme Co. v. Selling,* 278 U. S. 573 (49 S. Ct. 92, 73 L. Ed. 513). It is the contention of the prosecution that in the maintenance of this suit the defendant also misrepresented to the circuit court, to this court and to the United States Supreme Court the status of the E. Henry Wemme company as a party plaintiff in the first suit. The de-

cision of the federal Supreme Court in the third case was announced December 3, 1928. January 21, 1929, the defendant, as attorney for two of the brothers and one sister of E. Henry Wemme filed in the circuit court of this state what the parties refer to as the fourth suit. The defendants were substantially the same persons that constituted the parties defendant in the other three suits. This suit after alleging dereliction upon the part of the trustees prayed for an enforcement of the trust, but as an alternative sought a recovery of the trust fund for the heirs. The decree of the circuit court dismissed the complaint upon a demurrer; the cause is now pending before us on appeal. In regard to this last suit the prosecutors make substantially the same charges against the defendant as in the three others. The foregoing we believe is a sufficient preliminary statement of the charges that the defendant practiced deceit. We shall now mention the charge which accuses him of having maintained these various suits for a selfish purpose only.

At the conclusion of the first suit, wherein this court held that the endowment fund was a public charity, the defendant was allowed $7,500 attorney's fees as compensation for his services in helping to defeat the claim of the churches and to establish the fund as a public charity. See *Wemme v. First Church of Christ,* 111 Or. 386 (227 P. 277). At that time he possessed a contract signed by the heirs whereby they agree to compensate him with 50 per cent of whatever he might recover for them through the defeat of the charity. At the conclusion of the first suit, and preliminary to the institution of the second, the defendant opened negotiations with the directors of the E. Henry Wemme company whereby he sought the corporation to agree

that it would compensate him with 50 per cent of whatever might be recovered for it in his contemplated second suit; later a contract was signed which promised him 33 1/3 per cent of whatever was recovered. These two contracts were of a continuing nature; that is, as long as the litigation continued the contracts remained in effect. It is the contention of the prosecution that Mr. Mannix was guilty of improper conduct, when, after having accepted a very substantial sum as compensation for his services in assisting to establish this charity, he thereafter sought to destroy it for purposes of personal gain.

We come now to a consideration of the evidence, and will first consider the testimony offered by the prosecution in substantiation of its charge that the defendant misrepresented to the courts the status of the E. Henry Wemme company as a plaintiff in the first suit. This suit was commenced June 13, 1922; at that time the Alien Property Custodian was in control of the E. Henry Wemme company by virtue of the fact that he had seized 92 per cent of its shares of capital stock. While it is not essential that we should determine whether the defendant was authorized to make that corporation a party plaintiff in the first suit and did so, nevertheless we deem it advisable to reach a conclusion upon that issue. It will be recalled that the name of the E. Henry Wemme company did not appear in the title of any of the pleadings filed in the first suit until the findings of fact were handed to the circuit court judge for signature, and that thereafter it appeared as a party plaintiff in all the court instruments including the decree, notices of appeal, undertakings on appeal, abstract of record, briefs, etc.

Reverting to the findings of fact we notice that the first finding recites: ''That the E. Henry Wemme

company is a corporation duly organized * * * and is the same corporation that is named as residuary legatee under the will of E. Henry Wemme, deceased. That all the other plaintiffs are the sole heirs at law of said E. Henry Wemme, deceased.'' A subsequent finding recites: ''Said E. Henry Wemme company, as residuary devisee under the will of said E. Henry Wemme, deceased, has no interest in or right to any of said property.'' The decree held ''that none of the plaintiffs has any interest whatever in any of said corporate stock or said property.'' The plaintiff's notice of appeal contains the name of the corporation as a party plaintiff, and recites ''the above named plaintiffs, August Wemme * * * and E. Henry Wemme company of Portland, Oregon, a corporation,'' appeal. The plaintiffs' undertaking on appeal likewise contains the corporation's name in its caption; the corporation's signature as a principal is subscribed thus: ''E. Henry Wemme company, by their attorney Thomas Mannix.'' The pronoun ''their'' includes the heirs. The defendant testified that the notice of appeal and the undertaking were possibly prepared by his stenographer and that the inclusion of the corporation's name escaped his attention. However, we notice that the undertaking on appeal of the Attorney General also bears the signature of the corporation as a principal by Thomas Mannix, attorney, as well as the signature of the heirs written by himself. Surely this instrument and the corporation's name subscribed to it by the defendant was not written by the stenographer. In fact, the defendant assumed full responsibility for signing the corporation's name to the undertaking of the plaintiffs and to the undertaking of the Attorney General; he testified thus (referring to the corporation's signature): ''Yes, it is there, but I say it was a mistake. I didn't have their authority to do that.'' In accepting

service of the notice of appeal, prepared by the Attorney General, the defendant signed thus: "Thomas Mannix, attorney for Wemme heirs, plaintiffs"; he accepted service of the Attorney General's undertaking on appeal thus: "Thomas Mannix, attorney for August Wemme and other plaintiffs." In our decision in the first suit reported in 110 Or. 179 (219 P. 618, 223 P. 250), the opening paragraph states: "Plaintiffs, with the exception of the E. Henry Wemme company, are the next of kin and sole heirs at law of E. Henry Wemme * * * The E. Henry Wemme company is a corporation. * * *" Wherever the title of the case appeared upon the abstract of record, briefs, etc., the corporation's name was included as a party plaintiff.

Mr. Guy C. H. Corliss, attorney for the churches, testified before the referees that he prepared the findings of fact and assumed responsibility for having introduced the name of the corporation into the record. He testified that shortly prior to the trial "Mr. Mannix came to the office, and I want to be perfectly fair to him, and I don't want to overstate what he said at that time, but he said one of two things, I am quite clear; either that he was authorized to appear for the E. Henry Wemme company, or was negotiating for authority and was very sure he was going to get the authority * * *. At that time, I don't know why I did it, but I remember that I got my office copy of the complaint and in my own handwriting I wrote the name of E. Henry Wemme company. * * *" The witness testified that upon that occasion Mr. Mannix invited a suggestion as to how the corporation could be made a party plaintiff, and that he, Corliss, recommended that both attorneys sign a stipulation making it a party. Corliss assumed that when he undertook the preparation of the findings of fact "the stenog-

rapher took the title from some paper, and probably from the complaint and the result was the findings of fact'' included the name of the corporation as a party plaintiff. The defendant's version of this conversation with Mr. Corliss was thus given before the referees: ''What I told Judge Corliss was that I had made application to the directors to obtain a waiver from the E. Henry Wemme company, and that I thought I was going to get it''; when asked specifically as to whether he told Mr. Corliss that he ''had obtained the consent'' he replied: ''No, sir, I don't think I did.'' We have mentioned the fact that Mr. Corliss became associate counsel in the second suit. He testified that when the defendant invited him to appear in that case he replied:

''One thing is certain, if I make an argument I will not take a position that the E. Henry Wemme company was not a party to that lawsuit because I see the findings of fact that I evidently prepared, that their name appears in the title; now whether you were or were not authorized to appear for them I don't know * * * but if I argue the case it will be on the assumption that the E. Henry Wemme company was a party to that suit.''

The defendant testified that he did not notice that the corporation's name appeared as a party plaintiff in the title of the instruments filed subsequent to the trial and in the decision of this court until he prepared the complaint in the second suit. The president of the corporation testified that the newspaper reports of this court's decision contained the name of the corporation as a party plaintiff. In the brief, which he presented to the federal Circuit Court of Appeals, he told the court over his signature ''it was only from newspaper reports that it was discovered after the supreme court decision that the E. Henry Wemme company was mentioned'' as a party plaintiff.

We shall now review evidence that indicates not only that Mr. Mannix knew that the corporation had come into that suit as a party plaintiff before the trial, but which also proves that he sought and obtained authority to make it a plaintiff. He freely admitted that on November 6, 1922, while the first suit was pending in the circuit court, he appeared before the board of directors of the corporation and requested authority to join the corporation as a party plaintiff. He testified before the referees: "I think they granted my request as I made it. By that I mean to say all I was asking of them was to use their name and waive their rights." By waiver of the corporation's rights he meant a surrender of any reversionary interest to which the corporation might be entitled in the property of the charitable trust so as to make the state's title to that property perfect. We shall later quote from the corporation's minutes and from a letter prepared by the defendant November 6, 1922, which will make it clear that the defendant sought, not a waiver, but authority to join the corporation as a party plaintiff. Another portion of the defendant's testimony gives a slightly different account of the action of the directors upon his above request. This other portion is in strict harmony with the minutes of the corporation, which recites that his request was referred to the Alien Property Custodian, and that the defendant "was instructed to prepare a letter which would be basis for a telegram to the Alien Property Custodian concerning this request." On the same day the following telegram was sent to that official by the corporation:

"Directors of E. Henry Wemme Co. received following communication   Gentlemen Mr. Dan E. Powers and I have been engaged as counsel by the Wemme

heirs to contest that part of the will of the late E. Henry Wemme relating to the E. Henry Wemme Endowment fund and the White Shield Home The Christian Scientists who are the stockholders of the E. Henry Wemme Endowment Fund have converted all the property to their own use and we believe there is good opportunity to recover for the heirs as the E. Henry Wemme Co. is the residuary legatee under the will We desire permission to join the said corporation as party plaintiff without any cost or liability whatsoever We would like your permission to join the said corporation as an immediate reply is hoped for as the case is set for trial on the twentieth of this month Very truly yours signed Thos Mannix This matter passed to you for attention and recommendation Wire answer Dow V. Walker.''

The defendant concedes that he prepared the letter copied in the telegram which we have just quoted. November 10 the Alien Property Custodian sent to the office of the corporation the following reply:

''This office recommends that the directors of the E. Henry Wemme company approve of joining the corporation ás plaintiff in the suit referred to in Mr. Mannix's letter to you quoted in your telegram.''

Both the defendant and Mr. Walker, who was the secretary of the corporation, denied that they had ever seen the foregoing reply, but when Mr. Mannix testified before the circuit court in his application for an attorney's fee (at the conclusion of the suit reported in 110 Or. 179) he volunteered the information:

''We had to obtain the consent of the Alien Property Custodian. It was necessary to get a clear title, and all parties had to be brought in * * * We went to Washington for that purpose and obtained his consent.''

To the circuit judge's inquiry "was that consent reduced to writing?" the defendant replied:

"That consent I think appears in the records; it wasn't reduced to writing by us, but telegrams came from the Alien Property Custodian to the board of directors, and I think the consent was made part of the record. I think it appears in the record of the president and governing directors of the Wemme company."

It will be at once observed that the foregoing testimony given by the defendant March 27, 1924, very accurately described the communication of the Alien Property Custodian and the authority therein granted. That testimony, spoken at a time when the matter was fresh in the defendant's mind is much more persuasive than his statements before the referees which consisted of mere denials of ever having seen the reply of the Alien Property Custodian. November 18, 1922, which was only two or three days after the receipt of the Alien Property Custodian's letter in Portland, the defendant prepared an instrument for the heirs' signature which expressed their consent that he and his associate could appear in the oncoming trial for the Attorney General as well as for the heirs. The defendant and one of the heirs signed this document; although it was not filed in the public records it was prepared for filing and bore the title of the suit. In designating the parties plaintiff it followed the names of the heirs with, "and E. Henry Wemme of Portland, Oregon, plaintiffs." We pause to note that the corporation's name is "E. Henry Wemme Company," and that the irregular, and somewhat unlawyerlike manner in which the defendant inserted the corporate name in this first instrument was also employed in the findings of fact and all subsequest instruments. From the foregoing it will be observed that it is established that on November 6 the

defendant sought from the corporation it's consent to become a party plaintiff; that before the referees he testified that he had obtained that consent; that on November 6 he prepared the basis of the telegram forwarded by the corporation on that day to the Alien Property Custodian; that November 10 that official in a letter forwarded the requested authority; that a few days after its receipt the defendant prepared the court instrument embracing the corporation's name as party plaintiff, and a few days later the defendant had a conversation with Mr. Corliss at the conclusion of which the latter inserted the corporation's name in his office copy of the pleadings. We come now to another line of evidence which supports the theory that when the name of the corporation was inserted into the record the defendant was aware of that fact; in other words proof that the corporation's name did not come into the record inadvertently, but by reason of the defendant's volition.

At the conclusion of the suit the defendant applied to the circuit court for an attorney's fee as compensation for services performed in the establishment of the public charity trust. He submitted an itemized claim which included the following change:

"Trip to Washington, D. C., and Boston in connection with the correspondence of Mr. Wemme with the Christian Science Churches, and obtaining permission from the Alien Property Custodian to join him as party to the suit under clause 10 of the will in order to make the title clear; time consumed being nearly a month, $1,500."

In support of this item the defendant testified before the circuit court judge:

"We had to obtain the consent of the Alien Property Custodian. It was necessary to get a clear title,

and all parties had to be brought in. Under clause 10 of the will the heirs were the residuary legatees, and he had confiscated all the property belonging to the German heirs, and it was necessary to get his consent. We went to Washington for that purpose, and obtained his consent. * * *"

It was at this point that the circuit judge asked the defendant "was that consent reduced to writing?" and received the reply previously quoted that the consent came in a communication filed in the records of the corporation. In support of his claim for remuneration · the defendant submitted to the circuit court a brief from which we quote:

"And in order to prepare the case it was necessary at the outset to make a trip to Washington, D. C., to obtain the consent of the Alien Property Custodian, because under the 10th clause of the will the heirs were the residuary legatees of all the Wemme property, and it was essential to have all parties on the record in order to obtain a clear title. After this consent was obtained * * *."

The award made by the circuit court was unsatisfactory to the defendant; he appealed to this court. From his brief filed in this court in support of his claim we quote:

"Respecting the item for joining the Alien Property Custodian, we might say that the United States or the Alien Property Custodian are not anxious to get themselves into litigation, and we could not obtain the consent of the Alien Property Custodian to come into this law suit except by taking the matter up in person with his office. And the fact that he was a necessary party is shown by clause 10 of the will and his rights could not be foreclosed without making him a party."

As a witness before the referees the defendant testified that he did not mean to indicate by the above quoted

language that he was seeking from the Alien Property Custodian the privilege of joining the corporation, nor that officer, as a party plaintiff, but sought from that official only the limited authority to waive any rights that the corporation might have in the endowment fund so that it could be established as a public charity. If he intended thus to express himself it is evident that in the several instances in which he reduced his thoughts to writing he used language which conveyed a very different idea. But in addition we have his letter to the corporation of November 6, which became the basis of the corporation's telegram to the Alien Property Custodian and which unequivocally, in referring to himself, states: "We believe there is good opportunity to recover for the heirs as the E. Henry Wemme company is the residuary legatee * * * we desire permission to join said corporation as party plaintiff."

We are firmly convinced that although the defendant has denied that the communication from the Alien Property Custodian, dated November 10, 1922, came to his attention that nevertheless he saw and acted upon it. As previously stated two or three days after that communication reached Portland, the defendant inserted the corporation's name in a court instrument which he prepared and signed; thereafter the corporation's name appeared in every court instrument in the same irregular manner that he wrote it into the aforementioned first instrument. He himself signed the corporation's name to the undertaking of the heirs and to the undertaking of the Attorney General. He must have read its name in the decision of this court and finding it there took no action. The newspaper reports of this court's decision contained its name. He testified before the circuit court judge that he had obtained

the consent of the Alien Property Custodian to use the corporation's name as a party to the litigation; he urged that fact in his brief in the circuit court as a basis for increasing his remuneration. For obtaining the Alien Property Custodian's consent he inserted $1,500 in his statement of charges; in his brief before this court he stated positively that he had obtained this consent. These facts are persuasive; the defendant's denials that he possessed authority from the corporation, and his testimony that he never intended to make it a party fail to overcome their effect. We shall mention, however, other circumstances which are equally persuasive. Mr. Mannix is an able, well-educated attorney of broad experience, who is informed upon the principles of law which govern the subscription of one person's name to a bond by another. He likewise is aware of the rules that govern a witness in testifying before a court. We do not believe that he would have signed the name of the E. Henry Wemme company to a court paper in the event that he lacked authority, especially not that of a corporation whose powers and property had been seized by the federal government. Likewise, we do not believe that he would have testified that he obtained authority to join the corporation as a party to litigation, sought $1,500 remuneration for having done so, and argued in three different briefs under his signature the merits of his claim without having some evidence to prove his contention, in the event he was challenged to produce it. These various acts affected materially the course of the litigation; they were substantial and involved the rights of individuals who would be quick to challenge a wrongful invasion of authority.

There is still another circumstance which persuades us that in November of 1922 the defendant introduced

the corporation's name into the record. In that month he held the conversation with Mr. Corliss which we have previously mentioned; according to the latter the defendant mentioned the Trading with the Enemy Act for the first time. Section 7 of that Act (40 United States Statutes at Large, p. 411) provides:

"Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war."

In the absence of the corporation the only parties plaintiff in the suit were the heirs, all of whom were citizens of Germany and therefore incapable of being parties plaintiff. The above circumstances, therefore, supplied a strong motive for the defendant to desire authority from the Alien Property Custodian to make the corporation a party plaintiff. The fact that in his conversation with Mr. Corliss the defendant mentioned the Alien Property Custodian and the Trading with the Enemy Act accompanied with the circumstances that at approximately that time the authority reached Portland and Mr. Corliss wrote the corporation's name into his copy of the complaint is a strong circumstance indicating that the defendant was aware of the arrival of that authority in Portland.

The above facts permit of only one conclusion; it is that when Mr. Mannix inserted the name of the corporation into the instrument above mentioned he was aware of the receipt in Portland of the Alien Property Custodian's communication dated July 10, 1922. We believe that he thereafter caused the corporation's name to appear in the title of all court papers subsequently filed.

From the foregoing it is apparent that the corporation was a party plaintiff in the first suit, and that its rights were then adjudicated. We come now to a consideration of numerous declarations, made by the defendant, in pleadings and briefs wherein he denied that the corporation was a party in that suit.

In the amended complaint in the second suit, which was verified by the oath of the defendant, we find:

"And as a further distinct and independent ground of jurisdiction the said E. Henry Wemme company is and has been divested of its interest and ownership of the assets of the said E. Henry Wemme endowment fund  *  *  *  in violation of the fourteenth amendment to the constitution of the United States and particularly to the due process of law clause thereof  *  *  *  by the state of Oregon acting through its courts, for the reason that the supreme court of Oregon rendered a judgment against the said E. Henry Wemme company  *  *  *  in which judgment the said E. Henry Wemme company was held to have no interest in the assets of the E. Henry Wemme endowment fund, and by the said judgment, all the interest in the said assets was transferred to the defendant trustees herein in the capacity of officials of the state of Oregon  *  *  *  and the said judgment is in violation of  *  *  *  said constitutional rights  *  *  *  in that the heirs of E. Henry Wemme commenced the suit in which the said judgment was rendered on appeal in the supreme court of Oregon in their own behalf and for themselves  *  *  *  and entitled as follows: (here is given the title of the cause in which the name of the corporation is omitted.)  And the said heirs later after trial of said suit had been completed, by amendment to the complaint, added the name of the said E. Henry Wemme company as co-plaintiff without its authority, advice or consent  *  *  *  but made the joinder in the caption of the complaint under the mistaken notion that by virtue of their heirship they had

such right. * * * And it is averred that at the time of said suit and judgment * * * the said E. Henry Wemme company was in the control of the Alien Property Custodian aforesaid and had no control of its own * . * * and during all times, while said corporation was under the control of the said Alien Property Custodian as aforesaid, it could not sue in its own behalf without the consent of the said Alien Property Custodian which consent was not obtained for the use of the said corporate name in the said suit * * * and it is further averred that neither the circuit or supreme court of Oregon obtained jurisdiction of the said E. Henry Wemme company in said suit * * *''; other allegations of that complaint are to like effect.

Substantially the same representations were contained in the various briefs prepared and filed in that suit by the defendant. For instance, in his brief in the federal District Court the defendant made the following statement, referring to the pleadings in the first suit: ''The name of the E Henry Wemme company did not appear in any of the pleadings and its being made a party after the trial was over and for the first time in the findings and decree was without its knowledge, advice or consent.'' That the allegations contained in the federal court complaint under the oath of this defendant actually misled the federal judge is illustrated by the following excerpt which we take from the same brief:

''The question of jurisdiction of the court was raised by the defendants by a motion to dismiss. The question was fully argued and citation of authorities filed. The motion to dismiss was overruled by the honorable judge of this court in a written opinion which admirably and clearly states the law and we are content to leave that question remain as it is without further argument or citation.''

In his reply brief in the same suit and court the defendant stated:

"* * * the rights of the E. Henry Wemme company were not adjudicated in the litigation in the state courts, and an examination of the pleadings, record and decisions in the cases in the state courts clearly show that fact, and the statement that 'the record shows the corporation was a party to that litigation with its knowledge and consent' is absolutely untrue and without foundation * * * nowhere in the record is there any evidence documentary or otherwise, that supports the statement that 'the corporation was a party to that litigation with its knowledge and consent,' * * * There is no contention that the Alien Property Custodian authorized the use of the name of the company, or any attorney to enter its appearance in the litigation. Res judicata is a good defense when clearly proven, but a misstatement of the facts, wilful or otherwise, is not justified in any case, and surely not in the case at bar where the plaintiffs have substantial rights while the defendants have only a shadow of right, which will disappear as reason and research lightens the way."

In the Circuit Court of Appeals the defendant's brief made the same assertions that are contained in the complaint and in the briefs filed in the federal District Court; we quote from it as follows:

"An unsuccessful attempt was made to secure the participation in the suit of the Alien Property Custodian and the E. Henry Wemme company. After the trial in the state court, as now appears, the churches inserted the name of the E. Henry Wemme company in the caption of findings of fact and decree entered in that court, in favor of said churches, but there was no pleadings involving the Alien Property Custodian or the E. Henry Wemme company in any way and no consent given and it was only from newspaper reports that it was discovered after the supreme court decision that the E. Henry Wemme company was mentioned."

It will be observed that it was essential to the success of the second suit that the defendant should convince the federal courts that the corporation was not a party to the first suit; he succeeded. We quote from the decision of the Circuit Court of Appeals (*Sutherland v. Selling*, 16 F. 2d 865) as follows: "The E. Henry Wemme Company was not made a party to that action, but its name was inserted as a party plaintiff in the findings and decree at the close of the trial."

Before analyzing the representations which he made in the course of the third suit we shall mention the testimony which he offered before the referees in explanation of the foregoing statements which we have quoted from the complaint in the federal court and from his briefs. He testified that these statements were substantially correct; that the corporation was not a party to the first suit; that Mr. Corliss had somehow introduced its name erroneously into the findings of fact and decree, and that the defendant's stenographer "by mistake" had continued its inclusion after Corliss' mistake and that he, the defendant, somehow had overlooked this error.

It will be observed that the defendant's explanations in the various briefs and pleadings as to how the corporation's name got into the record of the first suit varied. Partially in explanation of this fact he testified:

"I drew the complaint hurriedly because the trustees of the E. Henry Wemme fund were selling the property, and I wanted to get an injunction, and as I say I had supposed from hearsay that Dan Powers had inserted the name but I didn't have the record for a long time afterwards";

Mr. Powers was his associate counsel in the first suit. From other parts of the defendant's testimony

it appears that he was not hurried when he prepared the complaint in the federal court; in fact, after deciding to bring the second suit Mr. Mannix spent some time in negotiations with the corporation for a contract which would reward him with 50 per cent of whatever he recovered before he finally accepted one which promised 33 1/3 per cent. Three weeks after he filed the complaint he prepared, verified, and filed an amended one which contained the same explanation concerning the corporation's status as a party plaintiff in the first suit that was contained in the original complaint.

We pass on now to the third suit and the defendant's references therein to the corporation as a party plaintiff in the first suit. It will be recalled that the third suit was filed in the circuit court of this state after the federal courts had dismissed the second one.

The third suit, which had as its sole plaintiff the E. Henry Wemme company, sought relief similar to that in the other two and presented substantially the same contentions. Both the district court and the Circuit Court of Appeals, in denying relief to the plaintiffs in the second suit expressly approved the decision by this court in the first one. We quote thus from the decision of the Circuit Court of Appeals "The decision of the Supreme Court of the state was correct." In the third suit the defendants plead by way of res judicata the decisions in the first and second suits; the reply sought to avoid the effect of these defenses by the allegation of new matter. Referring to the first suit the reply signed by the defendant alleges:

"* * * it is denied that the said E. Henry Wemme company was ever at any time joined in such lawsuit or that it ever appeared as a party in said law suit, or that it was represented or that there were any

pleadings involving any of its rights, or rights claimed by it, and further it is denied that it received any notice upon appeal or knew in any way that its name had been used for the first time in the findings of fact filed after the trial in the circuit court aforesaid, and further denies that it appeared before the supreme court of the state of Oregon or made any claim therein, or was represented in any way therein, but on the contrary alleges the fact to be that the suit referred to and culminating in the decision 110 Or. 179 was between the Christian Science churches on one side claiming the property involved as their own and the attorney general and the aforesaid Wemme heirs claiming a trust * * * and further denies that any of the rights of the said E. Henry Wemme company were litigated in said suit. * * *''

Replying to the allegations of res judicata arising out of the federal court's decision in the second suit the reply alleged:

''* * * plaintiff alleges that the United States district court for the district of Oregon had no jurisdiction of the action commenced in that court * * * and had no jurisdiction of the parties in said action, but that the said action was one that the said United States district court for the district of Oregon had no power to decide upon the merits because of its want of jurisdiction as aforesaid. * * * That the said United States circuit court of appeals for the ninth circuit of the United States had no jurisdiction to entertain the appeal set forth in the said fourth defense except for the sole purpose of dismissing said suit for want of jurisdiction in said United States district court for the district of Oregon.''

The reply also averred ''that the decision of the said court upon said appeal was not a decision upon the merits of said action, but for want of jurisdiction as aforesaid.'' These pleadings were prepared by the

defendant and bear his signature alone. His brief in support of the third suit contains many statements that the corporation was not a party to the first suit. In fact, the brief argued that the decision in the first suit was binding only upon the Attorney General and the churches. It contended that since the heirs were not the residuary legatees they had no interest in the charity fund which would enable them to test the validity of the portion of the will making provision for the charity; the brief, after asserting that the corporation was not a party to the first suit, argued that, therefore, the result in that suit was not binding upon it. This brief was signed by the defendant and two other attorneys. We come now to the brief submitted by the defendant to the federal Supreme Court when he sought to persuade that tribunal to take jurisdiction on certorari of the third suit. We quote from his brief in that suit as follows:

"In the findings of fact and decree filed in the following year, January 16, 1923, in the said circuit court the name of the E. Henry Wemme company, plaintiff herein without any authority therefor having been given by said corporation, or any of its rights having been mentioned or set forth in the pleadings was unauthorizedly inserted in the caption for the first time. But the rights of the said E. Henry Wemme company, plaintiff herein, were in no way involved, set forth, contested or mentioned in the trial or in the pleadings of the said lawsuit between the other parties aforesaid. Appeal was afterwards taken to the supreme court by the counsel representing the attorney general, and by no one else, and the opinion of the supreme court appears in 110 Or. 179 * * * On appeal to the state supreme court in *August Wemme et al. v. Church of Christ et al.,* 110 Or. 179, the E. Henry Wemme company was in no way present or in any way represented or mentioned or referred to and its only connection

with the case was that its name had been unauthorizedly inserted after trial and decision as aforesaid. Probably the name in the caption misled the supreme court but a mere reading of the record and briefs would have corrected such mistaken assumption and shown that at no time was it a party to the suit.

"At no time was the E. Henry Wemme company represented in *August Wemme et al. v. First Church et al.*, 110 Or. 179, either by Mr. Powers or Mr. Mannix or any other attorney and no one ever claimed to represent the said corporation, nor did any one have authority to represent it. * * *"

Another statement made by the defendant in the same brief we deem very material. Before quoting it we shall say, by way of preface, that the defendant's brief in the federal courts in the second suit argued that those courts had jurisdiction over that suit. He concedes that when he endeavored to persuade the federal Supreme Court to assume jurisdiction over the third suit he argued that the federal District Court and the federal Circuit Court of Appeals had no jurisdiction over the second suit. We shall not quote from the various portions of his brief where he made these inconsistent assertions, because it is possible that an attorney in good faith might make such assertions. But we deem the following excerpt from his brief in the United States Supreme Court in the third suit inexcusable:

"The E. Henry Wemme company was only a nominal party to the federal suit. The alien property custodian brought the suit for the express purpose of recovering the property involved for the United States government. The interest of the alien property custodian was hostile to the E. Henry Wemme company, for he forced it to join him in a suit, the object of which was to recover property belonging to the E. Henry

Wemme company for the United States government. The E. Henry Wemme company had no personal interest to subserve in such a suit. It was immaterial to it as a corporation which of two contending parties claiming its property, succeeded. The foregoing statement shows that it was not the real party in interest, and that its name was being used in the federal suit by the alien property custodian to accomplish a purpose of his own. Obviously such a use of its name unauthorized and beyond the powers of the alien property custodian, could not estop it to assert its own rights when the impediment to such action is removed.''

We say that the defendant's statement just quoted was inexcusable, because it was untrue. It is clear from the defendant's testimony that the Alien Property Custodian did not institute the second suit upon his own volition, but upon the request of the defendant who solicited such action on behalf of the Wemme heirs; the stock of the latter had been seized but they still regarded themselves as owners of it. The defendant testified before the referees that just before he prepared the complaint in the second suit August Wemme came to his office and requested him to do so. Before this suit was commenced the defendant consulted the officers of the corporation and persuaded them to grant him authority to file the suit; after several interviews with them he obtained a contract which promised him as compensation for his services one-third of whatever was recovered. Clearly under such circumstances his statement to the federal Supreme Court was unwarranted. It is interesting to contrast this statement with the following one over defendant's signature and oath which we have taken from the amended complaint in the second suit:

''And it is averred that the name of the E. Henry Wemme company under the control of the alien prop-

erty custodian aforesaid, was joined as plaintiff in this suit as a nominal party in the caption of the complaint by the said heirs aforesaid, but this was done without the consent or authority of the alien property custodian or the said corporation, and was purely and entirely the suit of the said heirs to recover the said property of the E. Henry Wemme endowment fund for themselves exclusively and alone and regardless of the right of the plaintiffs herein, and the said heirs made no claim under the residuary clause of the said will, namely clause eight, and there were no pleadings or issues involving the E. Henry Wemme company in any way except the nominal joinder aforesaid.''

Since the fourth suit is still pending before us we bring to a close at this point our review of this portion of the charges without referring to that suit and shall now state our conclusions.

The communication from the Alien Property Custodian authorizing the corporation to become a party plaintiff in the first suit was never filed in the public records; in fact the original of that communication was lost or destroyed. If the Alien Property Custodian had not preserved a copy of it, and if the defendant in his anxiety to secure a sizable fee had not described this communication in the proceedings which awarded the attorneys' fees at the close of the first suit, the mystery of the corporation's irregular appearance in the first suit might never have been solved. The disappearance of that communication, the fact that it had never reached the public files, the irregular, unexplained manner in which the E. Henry Wemme company entered the first suit as a party, apparently emboldened the defendant to allege over his signature and oath the explanatory matter in the second suit which persuaded the federal courts that the corporation never was a

party to the first suit. Encouraged by that success various explanations were made in subsequent briefs and pleadings by the defendant in an effort to rid himself of the effect of the decision in the first suit. It served his purpose at the close of the first suit to claim that the corporation had become a party to it; but, subsequent litigation could not succeed unless he was able to establish somehow that the corporation had never become a party to that original case. Unfortunately the defendant was willing to resort to deceit to accomplish that purpose. We regret exceedingly the necessity of making such a statement concerning a member of the bar. Before making it we read the voluminous record with painstaking care, especially every portion of it to which the defendant called our attention. We entered upon our task with minds reluctant to infer guilt, and with a determination to presume honesty wherever such a presumption was reasonably possible. The record from which we have drawn our conclusion is one of which the defendant is the author. He, and no one else, wrote these various statements which disprove one another. It is true that at times other attorneys were associated with Mr. Mannix, but the latter was always the chief counsel. Due to the defendant's intimate knowledge of the facts the other attorneys accepted as true his statement of them. If it was reasonably possible to believe that the defendant was unaware of the receipt in Portland of authority to make the corporation a party plaintiff to the first suit the conflict between his various representations would lose their damaging effect. But, such a belief is impossible; it is precluded by numerous writings of which the defendant was the author and by his positive testimony offered at a time when all of the circumstances were fresh in his mind.

■■ The defendant has been actively engaged in the practice of his profession in this state for more than 20 years. The task of making an adverse finding against any attorney of such long residence in our midst upon a grave charge of wrongdoing is a most unpleasant one. Moreover, it should not be done unless the evidence clearly establishes the truth of the complaint. A judgment of guilt upon a charge of deceit is always unwelcome and injurious. But the evidence is clear and convincing; it demands and warrants a finding that in the maintenance of the Wemme cases the defendant resorted to deceit. We, therefore, record our finding to that effect.

Section 1082, Or. L., provides:

"It is the duty of an attorney, * * * To employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the court or jury by any artifice or false statement of law or facts;"

Both this section of our code, and the general rules of law established by precedent independent of such enactments, provide that an attorney who resorts to deception for the purpose of polluting justice is subject to disbarment: Thornton on Attorneys at Law, § 778; 2 R. C. L. Attorneys at Law, p. 1091, § 183; and 6 C. J., Attorney and Client, p. 596, § 56.

■ The next subdivision of the charges avers that the defendant misrepresented to the circuit court and to this court the nature and extent of the services he had performed in the first suit and for which he sought compensation. As a witness in behalf of his claim he testified that shortly after the first suit was begun he reached the conclusion that the heirs could not win it. Indeed he went beyond that statement and testified:

"I never took any active part for the heirs at all in this case, at no time, because I never believed at any time that the heirs could win. I made the heirs party to the case as a matter of strategy": he testified that as soon as he had reached that conclusion he advised his clients of that fact and obtained from them a waiver releasing to the state any possible interest they might have in the fund so as to strengthen the state's title to it. We quote from his testimony the following:

"After I begun to investigate the case * * * I decided that the heirs could not win * * * so we consulted Mr. Wemme and told him we could not proceed to try this case for the heirs without stultifying our intelligence * * *. We therefore made a contract with Mr. Wemme whereby the rights of the heirs were waived."

He added:

"We are prepared to prove at this time beyond the peradventure of a doubt that we had an agreement with the heirs within a month from the time we took the case that we should devote our time exclusively to recovering this property for the state of Oregon, and at no time did we make any brief for the heirs; so our efforts from the outset were for the purpose of recovering this property for the state and I want that to appear in the record, that at no time did the heirs make any contest; they waived their rights in writing; * * *."

Again referring to his testimony we notice that he testified, "I want it distinctly understood that at no time did we act for the heirs, nor did we file any briefs for the heirs, and at no time did I make an argument for the heirs." The defendant added that he devoted substantially all of his time to that suit. We quote from his testimony once more: "I had practically to give up all my business * * *. We had spent over

a year, spent all the money we had, had about ruined a good business * * *.'' He presented to the circuit court an itemized claim of expenses which he alleged he had incurred in the maintenance of the suit on behalf of the public; it amounted to $10,425, exclusive of his charges for fees. One item, being $3,500, was accompanied with the following explanatory matter: ''Office expenses, stenographer, rent for a period of approximately 18 months. During this period of time my other business was turned over to counsel hired for that purpose, and my time was devoted to the Wemme case largely.'' Another item of $2,000 was accompanied with this explanatory note, ''agreed to pay August Wemme for obtaining consent of heirs to have all parties work for the recovery of the estate for charity.'' Still another item is the sum of $1,500 which we have already mentioned; it constituted the defendant's charge for obtaining the alleged consent of the alien property custodian ''to join him as party to the suit * * * in order to make the title clear; time consumed being nearly a month.''

From the above it is evident that the defendant claimed that shortly after he commenced the first suit he gave himself over unreservedly to the cause of the state. In fact he not only contended that he abandoned the suit of the heirs, but that he went to the extent of obtaining for the state a conveyance of the heirs' interest in the charity fund. Yet we find that on November 6, less than one month before the trial commenced, he prepared the letter to E. Henry Wemme company, which became the basis of its telegram to the Alien Property Custodian. That act instead of serving the cause of the state, attempted to defeat it's claim by bringing into the suit the residuary legatee of Mr.

Wemme's will. We have previously quoted that letter in full; at this time we refer again to that portion of it which states: "We believe there is good opportunity to recover for the heirs."

Next it will be observed from his aforementioned statement that he claimed he had advised the heirs that they could not win; as a witness before the referees he testified that after he instituted the first suit he became satisfied that the heirs could not win it and told them so. Yet, on behalf of them he prosecuted an appeal to this court. Two of the assignments of error contended that "the lower court should have decided that the plaintiffs were entitled to the property." His brief in support of his appeal was in the alternative; that is, it argued for both the state and the heirs, and asked for a recovery for the one if the other lost. Thus he was endeavoring to defeat the churches only.

It will be recalled that the expense item for $2,000 was accompanied with a statement that Mr. Mannix had agreed to pay that amount to August Wemme because the latter had obtained the consent of the heirs that "all parties work for the recovery of the estate for charity"; that is, the expense item so states. The defendant's brief in this court in commenting upon this item declared "the supreme court can judge whether it was worth $2,000 to get rid of the heirs so that this case might proceed in behalf of the charity and the title made perfect." We find no such an instrument in the record. The nearest approach to such a document in the record is one dated November 18, 1922. It recites:

"Our attorneys Thomas Mannix and Dan E. Powers may act for us and also for the state of Oregon and for the attorney general thereof in the above entitled proceeding, our chief aim being to recover the E. Henry

Wemme Endowment Fund from the Christian Science defendants, without a disclaimer however, * * * and in case the court decides this law suit in favor of the attorney general or the state of Oregon, we hereby consent that the said Thomas Mannix and the said Dan E. Powers may recover reasonable compensation out of the trust fund * * * our chief aim being to win this law suit for the state of Oregon or for ourselves, as the law may be * * *.''

This instrument bears the signature of only one of the heirs. We fail to understand how it could have accomplished the broad, sweeping effect which the defendant constantly claimed for it. He claimed $1,500 for having obtained the consent of the Alien Property Custodian ''to join him as a party to the suit.'' It is now abundantly evident that his visit to Washington, D. C., did not produce this consent, but that it came without hesitation when the directors of the corporation requested it by telegram. It is interesting to notice the explanation which the defendant made before the referees concerning this item. He then testified: ''No, sir, I did not get it; * * * I want you to understand that the only consent I ever wanted was a waiver and not a consent to litigate the rights of the E. Henry Wemme company as residuary legatee.'' Certainly the expense items, briefs prepared by the defendant, and the oral testimony given by him at the close of the first case are in complete variance with the testimony just mentioned. We are satisfied that the defendant wilfully misrepresented to the circuit court and to this court the services which he had performed in establishing the trust as a public one.

The remaining charge submits that it was unprofessional for the defendant to institute litigation which had as its objective the destruction of the charity when

he had accepted $7,500 compensation for services performed in its establishment. It would be difficult for us to dispose of this charge without expressing an opinion upon issues involved in the fourth suit, which is still pending before us. Due to this circumstance and the fact that we have already determined adversely to the defendant charges of material consequence, we deem it advisable to forego a consideration of this remaining subdivision of the complaint.

■ The only matter, therefore, which is left for decision is the extent of the discipline which should be inflicted. We have previously mentioned the recommendations of the referees. Their report gives much evidence of a very careful consideration of the facts of this case; this circumstance, together with their well recognized legal attainments, lends great weight to any recommendation made by them. Upon all of the issues so far reviewed by us their findings were unanimous, and our investigation of the evidence brought our minds into accord with theirs. The referees, however, disagreed upon the extent of the discipline which should be imposed. Two believed that a revocation of the accused's license for three years would suffice, while the third advised permanent disbarment. The two, who advised a withdrawal of the license for three years, did not believe that Mr. Mannix's misconduct affected the administration of justice fundamentally; they did not believe that it wronged "the root of the powers and independence of the court as a governmental feature." We do not agree with this conclusion. To us it seems that any attorney who, in the maintenance of a suit, attempts to pervert justice by deceiving the courts is guilty of a wrong that is fundamental. It is difficult to conceive of an abuse to the administration of justice that could be

worse. The following excerpt taken from Jessup's The · Professional Ideals of the Lawyer, p. 17, is appropriate:

"The lawyer's duty towards the court of which he is an officer may be violated by anything in his conduct. (a) That shows disrespect to or tends to breed disrespect to the court, or the judges there presiding. (b) But more vital a breach of duty is it when the lawyer, jointly associated with the court of which he is an officer, so conducts himself, in their common task of administering justice, as to influence the mind of the court by suppressio veri or suggestio falsi, by concealment or by active deceit, to make a decision which could not be secured if all the facts, which the 'truthfulness, candor and frankness' rule require should be known to the court were in fact so truthfully made known."

From Thornton on Attorneys at Law, § 894, we quote:

"It is clear, of course, that when an attorney's misconduct is such as to demonstrate that he is unfit to practice, his license should be revoked for the protection of the court and the proper administration of justice. On this theory it has been said that when a lawyer has been convicted of want of honesty and integrity, it can not be claimed that he should be suspended rather than disbarred. * * * But the practice is by no means uniform on this point. On the other hand, in the absence of a controlling statute, it has been held that to justify disbarment of an attorney one of three things should be established * * * (3) such intentional fraud upon the court or a client as shows evidence of moral turpitude * * *."

■ The evidence before us shows a long continued course of misrepresentations which the defendant wilfully made to the courts of this state and to those of the federal government. He did not confine himself to a single wrongful act, but repeated his deceit in new litigation and before different courts. His misrepre-

·sentations were in regard to material facts, and as is evident from preceding quotations were effective in some instances. He never retracted, apologized or explained. His wrongful course of conduct has been at the expense of a charity; indeed, the charity has been in continuous litigation for almost a decade, and those whom Mr. Wemme intended should be the recipients of his bounty have not yet been reached. The constant, vexatious, expensive litigation has caused repeated postponements of all altruistic activities of the endowment fund. Further, as every lawyer knows, unwarranted, inexcusable litigation of the type that Mr. Mannix has maintained in the state and federal courts over the Wemme will since 1922, seriously weakens the public confidence in the administration of justice. Until the prosecutors conducted their painstaking investigation into the methods employed by the defendant in the maintenance of this never-ending litigation for the overthrow of a deceased's charitable bequest, and discovered the deceit which made the repeated suits possible, the Wemme cases stood as a reproach to our scheme of justice. Now the facts are revealed, and we see that a decision announced by this court February 26, 1924, has practically been defeated by unwarranted litigation based upon false representations. Further the record before us shows that one who, as an officer of the courts, owed a duty to facilitate justice sought repeatedly to prevent it. There is only one remedy that is adequate; it is to order a permanent revocation of the defendant's license to practice his profession. Such will be done.

COSHOW, C. J., and BELT, J., concur.

BROWN, J., concurs in result.

RAND, J., and MCBRIDE, J., not participating.

BEAN, J. (dissenting in part). These two proceedings were conceived in animosity and bitterness between two lawyers over lawsuits. The clients of neither are complaining. I have read and studied with care the report of the honorable referees in the case of *State of Oregon ex rel. v. Thomas Mannix.* The charge in regard to the checks in question is, in my opinion, sustained as to a portion of the amount of the smaller checks; that relating to the two larger checks is not sustained by the evidence. The matter of the checks is an old one and the evidence is faded.

I am not entirely in accord with the construction of the opinion of Mr. Justice Brown in the second so-called Wemme case in this court, which has an important bearing upon this proceeding.

The referees had a herculean task in reviewing the several cases. I heard all of the cases in this court. I give great weight to the findings of the referees. I think the testimony sustains and that the judgment of this court should be that the respondent, Thomas Mannix, be suspended from practicing before any of the courts in this state for the period of one year.

———

Rehearing denied September 4, 1930 .

PETITION FOR REHEARING DENIED

(290 P. 745)

ROSSMAN, J. The petition for rehearing and the brief which accompanies it displays much evidence that the defendant has painstakingly compared the recitals of fact contained in our decision with the voluminous record upon which it is based. When we prepared our decision, which constitutes a review of almost a decade of important litigation prosecuted through

many courts, we were fearful lest we might omit some important fact or attach undue significance to some minor detail; but, since the brief now before us presents practically no new argument and challenges our findings in no important detail, we feel an added assurance that our conclusions are free from any serious error.

We deem it unnecessary to express our views upon all of the issues presented by the petition for rehearing and its accompanying brief, many of which are only restatements of issues already disposed of.

The brief argues once more the admissibility of the testimony which the defendant sought to introduce by affidavit at the time of the argument before this court. It states that he sought from the referees a postponement of the day of trial so that he might properly prepare his defense against the charges that he issued checks at times when his bank credit was inadequate. A careful review of the transcript of the proceedings before the referees contains no indication that such a request was made. Our decision, in disposing of the motion to introduce this new evidence, mentioned the defendant's desire to offer the testimony of one George Celsi, who is the manager of the Basket Grocery & Delicatessen Company. Our opinion states: ''Mr. Celsi did not testify at the trial although he was present upon the subpoena of the defendant and held a conference with him. It seems to us that under these circumstances it is now too late to ask the court to reopen the taking of testimony in order that Mr. Celsi might give the foregoing testimony.'' The petition for rehearing states:

''In the prevailing opinion of the supreme court it is said: 'Mr. Celsi did not testify at the trial, although

he was present upon the subpoena of the defendant and held a conference with him.' This is utterly untrue. Mr. Celsi had been subpoenaed by the defendant, but did not come to Salem as he could not be found at the time this matter came up, and the only place in the record where this statement appears is in the argument of one of the prosecutors whose innocent mistake in this regard misled the Honorable Justice who wrote the prevailing opinion.''

We now quote from page 219 of the transcript of testimony taken before the referees; the witness upon the stand is the defendant himself. ''Q. When did you discuss it with him? A. I discussed it with Mr. Celsi, I subpoenaed him up here and discussed it a week ago.'' We are satisfied that this excerpt, taken from the defendant's testimony, warrants the statement appearing in our decision.

The petition for rehearing copies occasional extracts from the briefs of the defendant in the first suit, wherein chance remarks are made that the heirs were the ones who commenced the first suit; that Wemme's will contained a provision for a reversion to the heirs; that ''We are representing the heirs, and we are authorized by them to appear,'' and like statements. The defendant argues that these statements, in which the words ''the heirs,'' and not the name of the corporation, was employed, substantiate his contention that in the first suit he made no representation that he was appearing on behalf of the corporation. These rare remarks are found in briefs whose title pages contain the name of the corporation as a party plaintiff. The mere fact that the defendant, in a few instances, referred to his clients as ''the heirs'' in briefs, whose title pages particularized the names of his clients, does

not demonstrate that the use of the quoted words was intended to indicate that he did not represent the corporation. The will bequeathed to the heirs substantially all of the capital stock of the corporation. If the Alien Property Custodian had not seized the shares the corporation could have been readily deemed the alter ego of the heirs. Even lawyers, when they are not concerned with technical niceties, frequently disregard the corporate title, and refer to the business by the name of its principal stockholder. In the present instance the heirs still regarded themselves as the stockholders even after the Alien Property Custodian had assumed charge of their stock and of the corporation; the defendant did likewise. They were the ones who instigated litigation on behalf of the corporation; in fact the heirs continued their interest in the corporation to such a substantial extent that they agreed to indemnify the Alien Property Custodian against all costs if he would file the suits which they urged him to commence. It was in truth a situation where the relationship between the heirs, the corporation, and the defendant, disregarded the corporate entity and considered the individuals as the important personages. Under these circumstances the occasional chance reference to "the heirs" could very well have been intended to include the corporation; or, possibly the defendant regarded the corporation as of such slight importance that he deemed it unnecessary to make special mention of it. Be this as it may Mr. Mannix in numerous instances, cited in our previous decision, positively represented to the courts in the course of the first suit that the corporation was a party to it.

The defendant, in endeavoring to substantiate his contention that he did not make the corporation a party

plaintiff to the first suit, reprints in his petition for rehearing the following excerpt taken from page 259, record of the Circuit Court of Appeals:

"Mr. Littlefield: Here is another matter I talked to counsel about, that is this: In the original case the alien heirs were first named parties plaintiff and the Christian Science Churches were named as parties defendant. Later on the E. Henry Wemme Endowment Fund was made a party defendant, but no order of any kind was ever made authorizing them to be made a party defendant. Later on, and in the same case, the attorney general of the state of Oregon was made a party defendant, but no order was ever entered authorizing him to be made a party defendant. Later on the E. Henry Wemme Company was made a plaintiff in that same suit, and no order was even entered authorizing the E. Henry Wemme Company to be made a party plaintiff. You will stipulate that as a fact, will you not?

"Mr. Mannix: I will stipulate what the record shows. I am not quite sure that you are right on that.

"Mr. Littlefield: I thought you understood that. I will introduce the record if you have any doubt about it.

"Mr. Mannix: Yes, I think it is better to introduce the record. I think, your Honor, it may be stipulated that the first place in which the name of the E. Henry Wemme Company appears in the judgment roll of the state court is in the findings of fact filed by Judge Corliss after the suit was over.

"Mr. Littlefield: I won't stipulate that.

"Mr. Mannix: I am not saying you will or won't. I just want to call the court's attention to it. May I show this to your Honor?

"Court (Judge Wolverton): What is it?

"Mr. Mannix: I want to show your Honor the first place where the name of the E. Henry Wemme Company appears in this litigation. It appears in the litigation first in the findings of fact and conclusions of law, in the state court.

"Court (Judge Wolverton): In the circuit court?

"Mr. Mannix: In the circuit court, yes."

We have again examined the transcript of record presented by the defendant to the United States Circuit Court of Appeals; we notice that the above is followed immediately by:

"Mr. Wickey: Mr. Littlefield was stipulating about there being no order in the circuit court as to the admission of these certain parties in suit in that court; that is, that they did not obtain a rule or order from the court permitting their being admitted as parties. Judge Littlefield made that statement here a minute ago as a stipulation. I say we have no objection to that—that there was no order in the state court, the circuit court, admitting these parties as defendants or plaintiffs, or whatever it was.

"Court: The parties simply appeared without leave?

"Mr. Wickey: They were made parties, and appeared without leave of court, yes.

"Court: I understand.

"Mr. Wickey: No objection to that. If that is the fact, let it go in."

Mr. Wickey was associate counsel with Mr. Mannix in the suit maintained in the federal courts. It will be observed that in the presence of Mr. Mannix, and as a portion of a colloquy in which the later participated Wickey outlined the manner in which the corporation had come into the case, and that it coincides with the conclusions expressed in our previous decision.

We deem it necessary to express our views upon only one more of the contentions advanced by Mr. Mannix. He calls to our attention the portion of the decision wherein we quoted an excerpt from "Trading with the Enemy Act." The defendant's brief states that August Wemme was not an alien enemy living in Germany, but was "a friendly alien domiciled in the

United States for a long time prior to 1922." Before preparing our decision we examined the record carefully to determine the status of the Wemme heirs at the time when the first suit was filed; the recitals in the pleadings verified by August Wemme and the briefs signed by this defendant stated that the heirs were residents and citizens of Germany. The defendant also contends that since the war with Germany terminated on the second day of July, 1921, the Wemme heirs had capacity to sue when the complaint was filed in the first suit. Our decision signified that we entertained a different understanding. In confessing an error in this respect we accompany it with the explanation that we failed in our decision to express the precise thought that was in our minds. When the first suit was ready for trial the Alien Property Custodian was still in possession of the shares of corporate stock and other rights bequeathed to the heirs by the deceased. The termination of the war did not at once restore them to their property. Almost two years after the termination of the first suit the defendant found it necessary to institute the second one in the name of the Alien Property Custodian, who was still in charge of the affairs of the corporation. Under these circumstances we fail to understand how the heirs could have maintained the first suit. In fact the defendant many times testified that as he was preparing the first suit for trial he was greatly concerned lest the Alien Property Custodian would confiscate everything that the heirs might recover. This situation, we believe, convinced the defendant that it was very desirable to add the corporation as a party plaintiff in the first suit. The corporation and not the heirs was the residuary legatee of the estate. It is so evident that this circumstance would

have caused Mr. Mannix to make the corporation a party plaintiff the moment he received the Alien Property Custodian's consent that we have previously deemed it unnecessary to make mention of it.

Mr. Mannix. brings to a close his argument for a rehearing with the charge that this court has been intimidated by the fact that Mr. George W. Joseph, the defendant's accuser, immediately preceding the announcement of our decision became the Republican nominee for governor of our state. Upon the same day the petition for rehearing was filed Mr. Joseph was removed from this life to the great tribunal above. We had hoped that our analysis of the evidence, practically all of which was taken from copies of the public records, would bear conviction that we sought the facts and let the result abide the event. The evidence persuaded our minds that the revocation of the defendant's license was not only warranted but demanded. Mr. Mannix does not argue that the record fails to justify the severe discipline imposed, and, as previously stated, his criticism of our findings instead of shaking our confidence in them convinces us that they are fully justified. To disbar a brother attorney, especially one who has practiced extensively in the courts of this state, and who has many times displayed a learning of the law which has commanded our admiration, is a most unpleasant task. It is one which we would have avoided had not our duty commanded its performance. Naturally under such circumstances the mind is loath to draw a result which will bring shame to the attorney and deprive him of his franchise to earn a livelihood by the means which he has industriously cultivated ever since he reached manhood. However, the facts have been announced; they have been gathered from a

record of which the defendant was the author. Now to have it said that something other than the evidence brought us to our conclusion detracts from that scant satisfaction we anticipated would be ours when an uninviting task had been finally terminated.

Being convinced that the record warrants the conclusion which our decision announced, it follows that the petition for rehearing will be denied.

McBRIDE and RAND, JJ., did not participate in this opinion.

BEAN, J. I adhere to the former opinion that the attorney be suspended from practicing for a period of one year.